| STATE OF OHIO | ) | |
|---|---|---|
| | ) SS: | <u>AFFIDAVIT OF MICHELLE NOVAK</u> |
| COUNTY OF CUYAHOGA | ) | |

Michelle Novak, being first duly sworn according to law, states as follows:

1.    I am over eighteen (18) years of age and have personal knowledge of the things and matters asserted herein. I am competent to testify thereto.

2.    I have been employed by CrossCountry Mortgage, LLC ("CCM") for approximately 7.5 years and am currently the EVP of Human Resources, a title that I have held since August 2021.

3.    In order to be employed by CCM, CCM requires individuals to sign an employment agreement with an arbitration provision.

4.    In my role, I am familiar with CCM's recordkeeping practices regarding employment agreements. I also have access to the files where employment agreements are customarily maintained by CCM. Attached at Exhibit A is a true and accurate copy of Paul Lundholm's executed employment agreement that is maintained in the ordinary course of business of CCM.

5.    To promote a prompt exchange of signatures on personnel documents and agreements during the onboarding process, CCM utilizes DocuSign. DocuSign is a tool that allows parties to provide electronic counterpart signatures on documents and certifies those signatures as valid electronic execution of the applicable personnel documents and agreements.

6.    At the beginning of a prospective employee's employment with CCM, a Human Resource associate uploads documents and agreements requiring an individual's review and authorization to DocuSign in an electronic "envelope." DocuSign then sends an email

1

EXHIBIT 1

invitation containing a unique link to an individual where he or she can access, review, and sign the documents. DocuSign's email invitation is sent to the Branch Manager, who will access, review, and sign the agreement. Once the Branch Manager signs the agreement, DocuSign will send the email to the prospective employee, who will access, review, and sign the agreement. Once the prospective employee signs the agreement, DocuSign will send the invitation to CCM's Chief Legal Counsel, Alex Ragon, who will access, review, and sign the agreement. Once this process is complete, DocuSign then sends the executed documents to all parties and CCM's Human Resources associate.

7.     As part of its secure process, DocuSign assigns a unique electronic identifier to the distributed documents and tracks the time of delivery, acceptance, and signature of the documents. DocuSign's secure system also generates a Certificate of Completion which shows: (i) the Envelope ID; (ii) when and to what e-mail address the documents were sent; (iii) when the documents were viewed by the recipient; and (iv) when the documents were electronically signed by the recipient.

8.     On March 30, 2022, Wage and Compensation Specialist Samantha Snyder prepared an Outside Sales Loan Originator Employment Agreement for Paul Lundholm. The Agreement contains an arbitration provision at Section 5.19 providing that the Employee will utilize binding arbitration to resolve all disputes arising out of or relating to Employee's employment with CCM. See Ex. A at ¶ 5.19.

9.     The agreement was sent to Ms. Snyder's supervisor, CCM's HR Director/Wage & Compensation Jennifer Brozak, who provided a final review of the agreement before it was sent by DocuSign for the requisite signatures. Ms. Brozak initialed the agreement to indicate her review. See Ex. A at p. 15.

10.   DocuSign sent the email invitation containing the documents to Branch Manager Michael Piazza for his review and signature.

11.   Upon Mr. Piazza's signature, DocuSign sent the email invitation to Mr. Lundholm for his review and signature. Mr. Lundholm signed the agreement on April 4, 2022. A copy of the Certificate of Completion evidencing Mr. Lundholm's signature is attached hereto at Exhibit B.

12.   Upon Mr. Lundholm's signature, DocuSign sent the email invitation to Mr. Ragon for review and signature, completing all signatures required for the agreement.

13.   Once all signatures were obtained, a completed copy of the agreement was sent separately to Ms. Snyder, Ms. Brozak, Mr. Piazza, Mr. Ragon, and Mr. Lundholm.

FURTHER AFFIANT SAYETH NAUGHT.

_____
MICHELLE NOVAK

SWORN TO AND SUBSCRIBED before me and in my presence this **7** day of March, 2022.

MEGAN MAGUIRE
Notary Public, State of Ohio
My Commission Expires:
March 22, 2025

_____
NOTARY PUBLIC

Commission Expiration **3-22-25**

3

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE



**CROSSCOUNTRY MORTGAGE, LLC**
**OUTSIDE SALES LOAN ORIGINATOR**
**EMPLOYMENT AGREEMENT**

**NMLS Unique Identifier: 598220**

This OUTSIDE LOAN ORIGINATOR EMPLOYMENT AGREEMENT ("Agreement"), dated as of **DATE OF HIRE** ("Effective Date"), is between CrossCountry Mortgage, LLC, an Ohio Corporation, with an address of 6850 Miller Road, Brecksville, Ohio 44141 ("Company") and **Paul Lundholm** ("Employee") (individually, each a "Party," and collectively, the "Parties").

WHEREAS, the Parties desire that Employee work in the employment of Company as an outside sales loan originator; and

WHEREAS, the Parties desire to set forth their agreement with respect to such employment in this Agreement;

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, the consideration for which receipt and sufficiency are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**
**EMPLOYMENT AND DUTIES**

1.1     <u>Commencement</u>.  On the terms set forth herein, Company employs Employee, and Employee agrees to be employed by Company as provided for herein.

1.2     <u>General Duties</u>.  Employee is an outside salesperson, whose primary duty shall be the sale of mortgage loan packages.  Employee will devote at least 80 percent or more of Employee's work time engaging in "outside sales activities."  In this regard, Employee's functions may include without limitation:

(a)     meeting with customers and prospective customers at the customers' homes or places of business, or other meeting places other than the Employee's workplace to sell mortgage loan packages (for the purpose of this Agreement, the Employee's "workplace" means Company's office or any other fixed location Employee uses as an office);

(b)     originating Employee's own sales by contacting prospective customers and developing and maintaining referral sources;

(c)     making personal calls on real estate agents and brokers, financial advisors, and other potential referral sources to develop borrower leads and other activities incidental thereto like attending seminars and trade shows;

(d)     writing sales reports, planning itineraries, and engaging in marketing and promotional activities in support of Employee's own sales;

(e)     engaging in the foregoing activities in a responsible manner, consistent with Employee's obligations to customers and in light of the considerable flexibility Employee has in setting his or her own working hours and schedule;

(f)     performing tasks incidental to all of the foregoing.

Employee shall also perform any other or additional duties that are assigned by Company from time to time or that are contained in this Agreement or in the manuals, guides, memoranda, e-mails and other materials that set forth the Company's policies and procedures ("Company Policies").

Pursuant to 29 C.F.R. §541.500(a), Employee understands he/she is deemed to be an outside sales employee by Company, and expected to engage in outside sales activities, including, without limitation, the sale of, solicitation of sales, promotional activities inclusive but not limited to attending conferences, open houses, and/or various networking events, either with potential clients or sourcing leads that could lead to a potential clients, and/or other activities incidental and in conjunction to such activities, at least 1-4 hours, once or twice per week.  Employee agrees to periodically re-certify to the foregoing at Company's request, as required by the Company, but no less than every 90 days.  Employee agrees that if such job duties or description changes, Employee will immediately provide notice to the Company in writing.

1



DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

Employee understands and acknowledges that the foregoing description of Employee's duties is intended to establish, and does establish, Employee as an "outside sales employee," as defined under applicable law.  Employee further understands and acknowledges that, as such, Employee is exempt from any provisions requiring payment of any minimum wage or overtime premiums.

1.3     Duty to Comply with Company Policies.  Employee shall comply with all duties and requirements imposed on Employee, as a loan originator and employee, as set forth in this Agreement and the Company Policies.  The Company Policies are effective as of the date of issuance, unless otherwise specified.  Company may modify the Company Policies at any time in its sole discretion.

(a)     Employee shall also perform any other or additional duties that are assigned by Company from time to time or that are contained in this Agreement or in the Company Policies. As an employee, Employee agrees to perform the duties that Company may, in its discretion, require and direct.  Employee agrees that Company has the right in its sole discretion, with or without cause, to modify all job assignments and compensation, including the terms of any Employee incentive pay or commissions, to change job titles, to reassign Employee to another location or division, or to reassign Employee's responsibilities throughout the course of Employee's employment with Company and that this Agreement shall be binding upon Employee at all times, irrespective of any such changes.  Employee's authority and services shall be subject to the direction of Company's officers and managers.

(b)     Employee agrees that, as a Loan Originator, Employee owes and is charged with the following duties and standards of conduct, among others specified elsewhere in this Agreement and in the Company Policies: (i) to exercise his/her duties and judgments in the best interest of Company and in good faith; (ii) to use extraordinary care, skill, and diligence in the performance of his/her duties; and (iii) to meet at all times Company's expectations and standards, as Company determines (and may modify) in its sole discretion.

1.4     Duty of Loyalty.  Employee shall devote appropriate time and attention to his/her activities for and on behalf of Company and shall not engage in any conflict of interest or conduct which shall reflect adversely upon Company. Employee shall assist and work for only Company and no other employer, lender, broker, or other entity, and shall not engage in any way in any mortgage lending or brokering, loan processing or underwriting services, loan modification services, real estate sales or acquisition, closing, settlement or title-related services, credit repair, credit counseling, borrower assistance or other business or service of the same or similar nature.  Additionally, Employee may not own an interest in any entity engaging in any such activities, other than a passive investment of less than one percent (1%), without the prior written consent of Company.  While employed by Company, Employee shall not, whether for remuneration or otherwise: (i) serve as an officer, director, or executive of or (ii) be employed or engaged as a consultant, independent contractor, or in any other capacity by, any other business (i.e., through any IRS-W-2, IRS-1099, staffing company, employee leasing, partnership, company affiliation, or other arrangement), except as approved in advance in writing by the President of Company.

1.5     Regulatory Compliance.  Employee is familiar with and shall comply with the Company Policies, and all applicable federal, state and local laws, ordinances, rules, regulations, guidelines and other requirements pertaining to the mortgage banking industry, to the business of Company, and to the origination, processing, underwriting, closing, or funding of mortgages, or other activities of Company, including but not limited to the Equal Credit Opportunity Act, Gramm-Leach-Bliley Act, Truth in Lending Act, Real Estate Settlement Procedures Act, USA PATRIOT Act, Home Mortgage Disclosure Act, Federal Trade Commission Act, Telemarketing and Consumer Fraud and Abuse Prevention Act, Fair Credit Reporting Act, Fair Housing Act, Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (the "SAFE Act"), Dodd-Frank Wall Street Reform and Consumer Protection Act and all related regulations to the foregoing Acts, and all similar federal, state and local laws, rules, regulations and requirements, federal and state telemarketing and do-not-call laws, rules and regulations, and all applicable guidelines and requirements of the Consumer Financial Protection Bureau ("CFPB"), United States Department of Housing and Urban Development ("HUD"), Department of Veterans Affairs ("VA"), Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), Federal National Mortgage Association ("FNMA" or "Fannie Mae"), Government National Mortgage Association ("GNMA" or "Ginnie Mae"), United States Department of Agriculture ("USDA") and all other applicable agencies, investors and insurers (altogether, the Company Policies and all such applicable laws, rules, regulations, guidelines and other requirements are referred to herein as the "Applicable Requirements"), in each case as amended from time to time.  Employee agrees to develop and maintain his/her knowledge and understanding of all such Applicable Requirements.  For purposes of emphasis, and without limitation of the foregoing, for the entire term of this Agreement, Employee shall:

(a)     Not charge any consumer any fees in excess of that permitted under Applicable Requirements;

(b)     Be and remain in compliance with all applicable (i) federal licensing, registration, and training requirements, including without limitation those pursuant to the SAFE Act, (ii) state licensing, registration, and training requirements of each state where Employee engages in loan origination activities, and (iii) the registration and compliance requirements of the Nationwide Mortgage Licensing System & Registry ("NMLSR");

2

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

(c)     Comply with the Regulation Z provisions on loan originator compensation, steering, and qualification (codified as 12 C.F.R. § 1026.36), as it may be amended from time to time;

(d)     Immediately report to Company any lawsuits, complaints, investigations or other similar actions which involve Employee's duties on behalf of Company or which could potentially affect Employee's registration or licensing status or ability to perform his or her job for Company.  Employee shall immediately notify Company in writing of any change in the status to his/her licenses, authorizations, and/or certifications and of any change to the background or qualification information submitted in support of such licenses, authorizations, and/or certifications. As a condition of Employee's initial and ongoing employment, Employee shall provide complete and accurate information to Company and to the various state and federal regulators. Employee authorizes Company to disclose, exchange, and discuss information regarding his/her background and qualifications with the various state and federal regulators; and

(e)     Abide by Company's policy to fully support equal opportunities in housing and lending and the laws and principles pertaining thereto. Employee agrees to, and shall, conduct his/her endeavors in full compliance therewith and shall strictly abide by all applicable fair housing and lending laws.

1.6     <u>Certain Restrictions and Requirements</u>.  Except as expressly provided herein, Employee will not, and shall have no authority to:

(a)     Enter into, act on behalf of, or bind Company with respect to any contract, commitment or agreement, unless Employee has first been expressly authorized in writing by the President of Company.

(b)     Close or arrange for the closing of any loan in the name of any person or entity other than Company, unless authorized in advance by Company.

(c)     Use any name, trade name, trade mark, service mark or logo of Company or an affiliate of Company for advertising, marketing or other business purposes without the prior written approval of an officer of Company.

(d)     Incur any expenses or obligations on behalf of Company unless permitted in the Company Policies or unless Company provides its prior written approval.  Employee shall promptly submit invoices and other supporting documentation for reimbursement of permitted expenses in accordance with the Company Policies.

(e)     Undertake or implement any business development plans or activities, without the prior approval of Company.

(f)     Use any forms or documents in connection with any application or origination of any loan, other than those forms and documents provided by Company or otherwise approved by Company. If Employee desires to use any form or document not provided by Company, Employee must first submit the item to Company for approval.

(g)     Use any Company e-mail addresses or technology, other than for the performance of Employee's duties on behalf of Company.

1.7     <u>Remittance of Funds</u>.  Employee shall not open, operate, or attempt to open or operate, any bank account in Company's name or any similar name.  All monies received by Employee for Company or on Company's behalf are funds belonging to Company and shall be made payable to Company.  All Company monies are held by Employee in trust for Company.  Employee shall cause all fees, charges, funds, and other amounts received by Employee to be remitted to the applicable office of Company in accordance with the Company Policies.

1.8     <u>Certain Employee Representations</u>.   Without limiting any obligations of Employee, Employee hereby represents and warrants to Company at all times during employment as follows:

(a)     Employee's employment with Company will not violate or conflict with any obligations Employee owes to any individual or entity, including without limitation, obligations arising out of or relating to (i) any non-compete, non-disclosure, non-solicitation or confidentiality agreements or provisions, and (ii) any prior employer or employment.

(b)     Employee knows of no reason why Employee could not or should not accept an offer of employment from Company, or otherwise be employed by Company.  Employee has not been subject to any investigation or sanction of any type, or denied any license or approval, by any federal, state or local government, quasi-government and private industry authority, including but not limited to any licensing authority, that would adversely affect Employee's registration(s), license(s), authorizations, or ability to perform his or her duties for Company.

(c)     In the ten (10) years immediately preceding the date of this Agreement, there has not been and there is not currently any outstanding orders, judgments, injunctions, awards or decrees of any court, governmental or regulatory body or arbitration tribunal against or involving Employee or his/her assets and there have been no actions, suits, administrative proceedings or claims against Employee, or, to his/her knowledge, pending, nor any actual or threatened investigations involving Employee and his/her assets that would

3

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

adversely affect Employee's license(s), authorizations, or ability to perform his or her duties for Company. In the ten (10) years immediately preceding the date of this Agreement and presently, Employee and any company or firm of Employee have not filed for bankruptcy nor been declared bankrupt or insolvent.

(d)    Employee currently possesses, and at all relevant times has maintained in good standing, any and all licenses, registrations, and authorizations required to conduct business as a loan originator for each state in which such business will be conducted.

(e)    In the event of a breach of the representations and warranties of Employee in this Section or if there is any other legal impediment which prevents Employee from entering into this Agreement or from performing all of his/her obligations hereunder, Company may terminate Employee's employment upon becoming aware of such breach of impediment and, in such event, Company shall have no financial or other liability or obligation to Employee under this Agreement. Any termination pursuant to this Section shall be by written notice to Employee and shall be effective on the date such notice is sent. Employee hereby acknowledges that he/she has been informed that Company strictly forbids the solicitation of any actual or prospective customers from any previous employment, either as an employee or independent contractor, for the purpose of switching these customers' loans from the previous employer to Company. Employee further represents that he/she has not taken any written records, computer disks, or other materials which are the property of any previous employer and shall not use any such written records or computer disks to solicit any loan applications or perform his/her duties hereunder.

1.9    <u>Committing Rates and Pricing</u>.  Employee shall lock loans in accordance with Company Policies and lock with Company's secondary marketing department the same program, rate and price that were committed to the customer.

1.10    <u>Truthfulness</u>.  At all times during the term of this Agreement, Employee agrees not to withhold or misrepresent material facts with regard to an applicant's income, assets, investments, debts, obligations, circumstances and information on the subject property. It is Employee's obligation and responsibility to disclose any and all information regarding an applicant's state of affairs that would customarily be taken into consideration in the evaluation of an applicant's creditworthiness. At no time will Employee advise an applicant to provide, or assist an applicant in providing, inaccurate information in relation to a loan application.

## ARTICLE II
## TERM AND TERMINATION

2.1    <u>At-Will Employment</u>.  Notwithstanding anything to the contrary herein:  (a) the Parties hereby agree and acknowledge that the employment relationship between them is wholly an "at-will" relationship, and neither Party shall have any obligation (whether arising by law, implication, custom or otherwise) to extend, maintain or continue Employee's employment with Company; (b) Employee's employment can be terminated at will, with or without cause, and with or without reason, at any time, (c) no employee or representative of Company has the authority to modify this at will nature of the employment except for the President of Company, and any such modification must be in a specific written agreement signed by both Employee and Company by its President.

2.2    <u>Termination upon Death or Disability</u>.  If Employee becomes Disabled (as defined below) or dies while employed hereunder, Employee's employment and Employee's rights to compensation hereunder shall automatically terminate (without notice) at the close of business on the date on which death or disability occurs. For purposes of this Agreement, Employee shall be deemed to have become "Disabled" upon Employee's inability to perform the essential functions of Employee's job, because of Employee's physical or mental illness or other incapacity which substantially limits a major life activity, for a continuous period of six (6) months or more, or a total of twenty-six (26) weeks in the aggregate within any twelve (12) month period. Employee understands that the ability to report to work on a regular basis is considered an essential function of his/her position. Company shall pay Employee any compensation earned by Employee as of the date of such termination in accordance with the normal payroll practices of Company or as otherwise required under applicable law.

2.3    <u>Company Property</u>.  All loans initiated and handled by Employee while employed by Company, and all related information, shall at all times remain the sole and exclusive property of Company. Employee agrees to promptly return to Company immediately upon request, at any time, and upon termination of employment, all Company property, including office keys, access cards, any electronic communications equipment issued by Company, documents, files, correspondence and notes, containing or relating to Confidential Material (defined below), and including but not limited to information obtained from the customers and prospective customers contacted by Employee, and the loans handled by Employee, while employed by Company, without keeping any copies. Employee shall assist Company in securing all original loan files and copies thereof, as requested by Company.

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

## ARTICLE III
## COMPENSATION AND BENEFITS

3.1     <u>Compensation</u>.  At all times during Employee's employment, as full compensation, Company hereby agrees to pay Employee as set forth below and in the commission schedule attached hereto as <u>Exhibit A</u>.  Company at all times shall have the right to modify the applicable compensation formula on a prospective basis upon notice to Employee.  Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

3.2     <u>Benefits</u>.  While employed by Company, Employee shall be entitled to the rights and benefits under any employee benefit plans provided by Company to similarly situated employees.  Nothing in this Agreement or in any other agreement between Company and Employee shall prevent Company from terminating or amending, in any manner, any Employee benefit, policy or benefit plan at any time or from time in its sole discretion, and Company shall have no liability or obligation to Employee in connection with any such termination or amendment.  Employee's eligibility for benefits shall be determined pursuant to the plan documents.

3.3     <u>Compensation at End of Employment</u>.    Upon cessation of Employee's employment, for any reason, Employee shall be paid any compensation earned up to and including the date employment ends.  Except as otherwise expressly provided herein, or required by applicable law, Employee shall not be entitled to any further compensation, including (but not limited to) draws, benefits, fringe benefits, commissions, or bonuses, as applicable.  Notwithstanding the foregoing, if on the date the Employee ceases to be employed, a loan is in Employee's pipeline and has closed and funded, and according to when commission is calculated in the normal pay roll cycle; as of the date of termination, resignation, or separation from the Company, and the loan meets the criteria of an Eligible Loan (as defined in Exhibit A and excluding element "(d)" of the definition), then the Employee shall be paid the commission for such loan.  Stated differently, Employee will NOT be paid on loans the close and fund after the Employee's last day of employment.  The commission, if any, will be paid within thirty (30) days after the end of Employee's employment.  Employee hereby covenants not to attempt to move any pipeline loan to any other person or entity following the end of employment.

3.4     <u>Withholding</u>. Employee acknowledges that all compensation earned under this Agreement shall be subject to applicable withholding and deductions.

3.5     <u>Sole Compensation</u>.  Other than as provided for in this <u>Article III</u>, Employee shall not be entitled to any other compensation or benefits.

## ARTICLE IV
## PROTECTED INFORMATION AND
## RESTRICTIVE COVENANTS

4.1     <u>Protected Information</u>.

(a)     *Confidentiality*.  Employee hereby acknowledges, understands and agrees that all "Confidential Material," as defined below, is the exclusive and confidential property of Company which shall at all times be regarded, treated and protected as such in accordance with this <u>Article IV</u>.  Employee acknowledges that all such Confidential Material is in the nature of a trade secret.  For purposes of this Agreement, "Confidential Material" means information, which is available to or used in the business of Employee and (i) is proprietary to, about or created by Company, (ii) gives Company a competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which would be detrimental to the interests of Company, or (iii) is designated as Confidential Material by Company, is known by Employee to be considered confidential by Company, or from all the relevant circumstances should reasonably be assumed by Employee to be confidential and proprietary to Company.  Such Confidential Material includes, without limitation, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential):

(i)     Internal personnel and financial information of Company, purchasing and internal cost and revenue information, internal service and operational manuals, computer software and systems and the manner and methods of conducting the business of Company;

(ii)    Company personnel names and contact information;

(iii)   Employee's compensation arrangements with Company;

(iv)    Training and educational materials provided by Company to Employee;

(v)     Marketing materials and/or marketing plans provided by Company to Employee; and

(vi)    Confidential and proprietary information provided to Company by any actual or potential customer, or other third party (including businesses, consultants and other entities and individuals), and shall include, without limitation, all of the customer's "non-public personal information," as that term is defined under the Gramm-Leach-Bliley Act of 1999 and any amendments thereto.

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

(b)     *Non-Disclosure*.   As a consequence of Employee's acquisition or anticipated acquisition of Confidential Material, Employee shall occupy a position of trust and confidence with respect to the affairs and business of Company.  In view of the foregoing and of the consideration to be provided to Employee, Employee agrees that it is reasonable and necessary that Employee make each of the following covenants:

(i)     At any time during the term of this Agreement and thereafter, except as required by law, Employee shall not disclose Confidential Material to any person or entity, either inside or outside of Company, other than as necessary in carrying out the business of Employee, without first obtaining Company's prior written consent (unless such disclosure is compelled pursuant to court orders or subpoena, and at which time Employee shall give immediate notice of such proceedings to Company).

(ii)    At any time during the term of this Agreement and thereafter, Employee shall not use, copy or transfer Confidential Material other than as necessary in carrying out the business of Company, without first obtaining Company's prior written consent.

(iii)   Upon termination of this Agreement, Employee shall promptly deliver to Company (or its designee) all written materials, records, software and documents made by Employee or which came into his/her possession prior to or during the term of this Agreement, concerning the business and affairs of Company, including, without limitation, all materials containing Confidential Material.

4.2     Rights to and Protection of Company's Intellectual Property and Inventions.   Employee agrees that Company is engaged in a continuous program of research, development, and innovation in connection with its business and the technologies, information and methodologies employed within its business; that Company's "Inventions" and "Intellectual Property" (as those terms are defined in this section) and information pertaining thereto are extremely valuable to Company; and that it is critical for Company to preserve and protect its Confidential Material and its rights in Inventions and in all of its Intellectual Property as set forth in this Agreement.

(a)     For purposes of this Agreement, the term "Intellectual Property" means all of Company's intellectual property including, but is not limited to: trademarks, logos, trade names, trade secrets, Confidential Material, copyrights, copyrightable works, non-copyrightable works, patents, domain names, database rights, customer lists, prospect lists, methodologies, know-how, websites, web-pages, search engines, designs, applications, data, programs, phone numbers, pager numbers, fax numbers, cell phone numbers, email addresses and accounts, and the like.

(b)     For purposes of this Agreement, the term "Inventions" means Company's inventions, improvements, designs, ideas, original works of authorship, formulas, algorithms, processes, techniques, compositions of matter, software programs or routines, compilations, databases, data results, know-how, websites, web pages, search engines, computer functionality, mask works or trade secrets.  The term Inventions is not intended to include any inventions that Employee developed entirely on his/her own time without using Company's equipment, supplies, facilities, or trade secret information except for those inventions that either: (i) relate at the time of conception or reduction to Company's business or to anticipated research or development of Company; or (ii) result from any work Employee performed for Company.

(c)     Employee agrees: (i) to do all things necessary in every proper way to assist Company to obtain, maintain and enforce its intellectual property protection for Company's Inventions and Intellectual Property rights; (ii) to sign documents that Company may reasonably request to obtain protection for Company's Inventions and Intellectual Property rights; (iii) to maintain the confidentiality of and guard the secrecy of Company's Inventions and Intellectual Property rights; (iv) that his/her obligations under this Section, Rights to and Protection of the Company's Intellectual Property and Inventions, will continue even after Employee leaves Company, and that Company will reimburse Employee at a reasonable rate after Employee leaves Company for out of pocket expenses actually incurred by Employee on its behalf in order to secure its Inventions and Intellectual Property rights; (v) that in the event Company is unable for any reason whatsoever to secure Employee's signature to any lawful and necessary document required or reasonably desired by Company to apply for, transfer or renew any patent, copyright, trademark, domain name, Invention or Intellectual Property right, Employee hereby designates and appoints Company (and its duly-authorized officers) as his/her agent and attorney-in-fact to act for and on behalf of Employee, to execute any such application, transfer or renewal documents and to do all other lawfully permitted acts to further the application, transfer or renewal of any of Company's patent, copyright, trademark, domain name, Invention or Intellectual Property right with the same legal force and effect, as if executed by Employee; and (vi) that during the course of employment, Employee agrees to promptly disclose in confidence to Company all Inventions,

6

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

including, but not limited to, improvements, designs, ideas, original works of authorship and/or trade secrets, that Employee conceives of, makes or creates, and/or that Employee first reduce to practice (either alone or jointly with others), whether or not in the course of employment, and whether or not such Inventions are patentable, copyrightable or protectable as trade secrets.

(d)  <u>Works for Hire</u>. Employee agrees that all Inventions, Intellectual Property, and Confidential Material (including but not limited to copyrightable works) that Employee conceives, contributes to and/or prepares within the course and scope of his/her employment are "works for hire," which shall be the exclusive property of Company.

(e)  <u>Assignment</u>. Employee agrees that all Inventions, Intellectual Property, and Confidential Material: (i) developed using equipment, supplies, facilities, information, trademarks, trade names, copyrights, Confidential Material, Intellectual Property, goodwill, know-how, or trade secrets of Company; (ii) resulting from work performed by Employee for Company; and/or (iii) relating to or used by Employee in Company's business (including but not limited to personal websites, personal email addresses/accounts, marketing materials, phone numbers, cell phone numbers, and screen names), are the sole and exclusive property of Company.  Employee hereby assigns and transfers to Company any and all right or rights which may arise in or to any such Inventions, Intellectual Property and Confidential Material.

(f)  <u>No "Moral Rights</u>." Employee hereby waives and agrees never to assert any "Moral Rights" that he/she might have in or with respect to any Invention and/or Intellectual Property during or after his/her employment with Company. "Moral Rights" means any right (or similar right existing under the judicial or statutory law of any country or treaty) to claim authorship of or rights to any Invention or Intellectual Property, to object or prevent modification of any Invention or Intellectual Property, or to withdraw from circulation or to control the publication or distribution of any Invention or Intellectual Property.

4.3  <u>Restrictive Covenants</u>.

(a)  *No-Solicitation*.  In order to protect and preserve Company's Confidential Materials, and Company's significant investment in developing its business, which investment Employee hereby acknowledges, commencing as of the date hereof and for a period of two (2) years following cessation of Employee's employment with Company (the "Limited Period") Employee shall not, directly or indirectly, separately or in association with others, interfere, disrupt or damage Company's business by soliciting, recruiting, attempting to recruit, or causing or assisting in the recruitment or attempted recruitment of, any then-current employee of Company, or any individual who has served in any such capacity at any time within the twelve (12) month period immediately prior thereto, for employment with another person or entity.

(b)  *No-Hire*.  In order to protect and preserve Company's Confidential Materials, and Company's significant investment in developing its business, which investment Employee hereby acknowledges, unless prohibited by applicable law, during the Limited Period, Employee shall not, directly or indirectly, hire, attempt to hire, or cause or assist in the hiring or attempted hiring of, any then-current employee, consultant or exclusive independent contractor of Company, or any individual who has served in any such capacity at any time within the twelve (12) month period immediately prior thereto, for employment.

(c)  *Solicitation and Re-Solicitation of Borrowers*.

i.  Employee agrees that (a) Company expends considerable time, money and resources to market to customers, to generate inquiries into Company's loan programs, to develop confidential methodologies to generate consumer interest in Company's loan programs, to maintain ongoing relationships with its customers, to develop and maintain business relationships with referral sources, and to acquire, compile and develop confidential and proprietary customer lists; (b) Company has a legitimate business interest in maintaining relationships and goodwill with current and prospective customers and referral sources and not having those relationships and goodwill unfairly interfered with; and (c) the relationships between Company and its past, present, and future customers, prospects and referral sources, and all rights therein, are and shall remain the sole and exclusive property of Company. Any referral source established by Employee during the term of this Agreement shall be the sole and exclusive property of Company.  Employee also hereby expressly acknowledges that the solicitation of, or the origination of a loan for, a consumer for whom a loan previously was processed and closed by Company may result in the imposition against Company of fines, penalties, reimbursements, indemnifications, damages and expenses ("Re-Solicitation Losses").

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

ii.       Employee shall under no circumstances solicit any consumer for whom a loan previously was processed and closed by Company during the longer of (a) the two (2) year period following the date of such loan closing and (b) such period as may be specified in the Applicable Requirements of the pertinent lender or investor with respect to the loan, if such solicitation or loan closing would result in a Re-Solicitation Loss to Company.  More generally, Employee shall not during the term of employment and for a period of two (2) years after his/her termination, resignation, or separation of his/her employment relationship with Company for whatever reason, directly or indirectly (whether on Employee's own behalf, working with others, or on behalf of any other person, business or entity): contact, call on or otherwise solicit or communicate with in any way any of Company's past, present or future customers, prospective customers and referral sources with the intention or effect of encouraging such customer, prospective customer or referral source to terminate or reduce the volume of its business with Company or to place any portion of such business elsewhere or otherwise interfere with Company's business.

iii.      Unless otherwise prohibited by applicable law, in the event of any breach of this Section, loans subject to any Re-Solicitation Losses would not be considered an Eligible Loan as defined in Exhibit A and would be subject to Section I.D. of Exhibit A.  Employee further agrees that a violation of this Section, Solicitation and Re-Solicitation of Borrowers, constitutes improper interference with Company's legitimate, actual and prospective business expectations and contractual relations with its customers, prospects and referral sources; constitutes a misappropriation of Company's goodwill; and unfairly and unjustifiably harms Company.  Accordingly, Employee agrees that: (a) the damages for improper interference, lost business opportunities, lost goodwill or lost clientele are uncertain and difficult to ascertain and that Company may be required to pay a recapture fee or similar fee to outside investors in the event a customer is refinanced by another lending institution within one (1) year (or longer) of closing a loan with Company; (b) in the event that Employee, directly or indirectly, (on his/her own behalf, working with others, or on behalf of another person, business or entity) solicits or conducts any transactions or business in violation of this Section, Solicitation and Re-Solicitation of Borrowers, then Employee promises, agrees and covenants to pay to Company all revenues that Company would have derived from the origination, funding and sale of the loan for each loan solicited or originated in violation of this Agreement, plus any applicable recapture fee or similar fee paid by Company to its outside investors.  Employee agrees that the amount stated in this Section, Solicitation and Re-Solicitation of Borrowers, is the agreed upon reasonable compensation and damages due to Company for such a breach, lost business opportunities, recapture fees incurred by Company, and lost goodwill and clientele, and that the stated amount is not a penalty and shall be due and payable by Employee to Company upon demand.  It is the Employee's affirmative obligation to determine whether any person with whom he/she (or any person or company/business by whom Employee is employed) has contact is a customer, prospective customer or referral source of Company.  In any proceeding to enforce this Agreement, there shall be a legal presumption that any mortgage related product of service provided to any of Company's past, present or future customers, prospects or referral sources by the Employee (or by any other person or company/business by whom Employee is employed) was undertaken and performed in violation of this Agreement.

4.4      Independent Covenants.  All covenants and provisions contained in this Article IV are independent of each other and may be separately enforced or enforced together.  If any of the covenants set forth in this Article IV is determined to be unenforceable because of its scope, duration, geographical area or similar factor, then the court making such determination shall have the power to reduce or limit such scope, duration, area or other factor, and such covenant shall then be enforceable in its reduced or limited form.

4.5      Irreparable Harm; Injunctive Relief.  Company and Employee recognize and acknowledge that in the event of any breach of any provision of this Article, irreparable harm will be suffered by Company and that any remedy available at law will be inadequate and Company and Employee do, therefore, agree that in such event Company shall be entitled to injunctive relief in any court of competent jurisdiction against Employee and against any other person or entity involved in or connected with such breach, without necessity of posting any bond, cash or security against/for Employee or any individual or entity involved in or connected with such breach, which rights shall be in addition to such rights as Company may have for damages and in addition to such other remedies as the law or equity may provide.  In addition to these remedies, damages resulting from the solicitation or employment of persons in violation of this Agreement are uncertain and difficult to ascertain and, accordingly, the Parties agree that Employee shall pay Company $9,250.00 for each person employed in violation of this Agreement, which is the agreed-upon and reasonable reimbursement and payment for the recruiting, interviewing, hiring and training of a replacement employee and for the loss of revenue and burden on Company resulting from the loss of revenue, goodwill, and the solicited employee, and is not a penalty.  In any proceedings to enforce this Agreement, there shall be a legal presumption that the employment of any employee or former employee of Company by Employee or the business with whom Employee is employed within the time periods set forth in this Agreement resulted from conduct in violation of this Agreement.  The amount stated as the agreed upon damages in this Section shall not diminish Company's ability to seek other additional relief as provided for in this Agreement or otherwise provided by law and is not a waiver of any agreements between Company and the employee or former employee employed in violation of this Agreement.

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

**ARTICLE V**
**MISCELLANEOUS PROVISIONS**

5.1     <u>Severability</u>.  The invalidity or unenforceability of any term or provision contained in this Agreement shall not void or impair the remaining provisions hereof, which shall remain in full force and effect as if such invalid or unenforceable provision had never been contained herein.

5.2     <u>Modifications, Alterations and Amendments</u>.  Company reserves the right to modify, alter or amend this Agreement prospectively upon written notice to Employee.  Such modifications shall not affect commissions earned but not paid.  Employee's continued employment after written notice of the modification, alteration or amendment shall constitute Employee's acceptance of the modification, alteration or amendment.  No modification, alteration or amendment of Employee's at-will status is effective, however, unless it is in writing and signed by Employee and an officer of Company.

5.3     <u>Further Assurances</u>.  Employee agrees to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered all such further documents that Company reasonably deems necessary or appropriate to carry out the terms and provisions of this Agreement.

5.4     <u>No Waiver</u>.  No waiver by Company of any condition, or the breach of any term, covenant, representation or warranty contained herein, whether by conduct or otherwise, by Employee in any one or more instances shall be deemed or construed as a further or continuing waiver of any such term, condition, representation or warranty set forth in the Agreement.  Any waiver must be in writing in order to be enforceable against Company.

5.5     <u>Successors and Assigns</u>.  Company may assign its rights and duties hereunder provided that the assignee is the successor, by operation of law or otherwise, to the business of Company.  Employee's rights and obligations under this Agreement shall not be assignable absent Company's prior written consent, which Company may withhold in its sole and absolute discretion.

5.6     <u>Enforcement</u>.  Employee agrees that (a) the promises, obligations and covenants undertaken under this Agreement have been agreed to freely, voluntarily and without duress as a reasonable condition precedent to employment and continued employment with Company and that they do not impose undue hardship on Employee; and (b) any violation or breach of Employee's post-employment obligations set forth herein will result in irreparable injury to Company for which no adequate remedy at law may be available.  Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by Employee in violation of this Agreement without the requirement of posting a bond, the same being waived by Employee.  The seeking of such injunctive relief shall not affect Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

        (a)     Should any post-employment obligation as set forth herein be deemed by a Court of competent jurisdiction to be too broad to permit enforcement to its full extent, thence such post-employment obligation shall be enforced to the maximum extent permitted by law. Company and Employee each hereby consent and agree that such scope may be judicially modified accordingly in any proceeding brought to enforce such provisions of this Agreement.

        (b)     Without limiting Company's rights or remedies under this Agreement or applicable law, if Employee breaches any of his/her post employment covenants or obligations to the Company, then all obligations of Company to Employee shall be terminated and Company shall be entitled to recover from Employee all costs and expenses, including reasonable attorney's fees, in connection with the enforcement, by suit or otherwise, of Company's rights hereunder or under applicable law.  Employee's post-employment covenants and obligations to Company as set forth in this Agreement shall survive Employee's termination.

5.7     <u>Governing Law</u>.  To the maximum extent permitted under applicable law, this Agreement shall be governed by and construed in accordance with the substantive laws of Federal law and the laws of the State of Ohio, without regard to provisions related to choice of law or forum.

5.8     <u>Survival</u>.  Notwithstanding anything herein to the contrary, Sections 1.7, 2.3, 3.3, and 3.4, and <u>Articles IV</u> and <u>V</u> shall survive termination of this Agreement and/or termination or resignation of Employee's employment with Company.

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

5.9     Notice.  Any and all notices, demands or requests required or permitted to be given under this Agreement shall be given in writing and sent, by registered or certified U.S. mail, return receipt requested, by hand, or by overnight courier, addressed to the other Party hereto at its address set forth above, contained within the Employee file, or such other address as such Party may from time-to-time designate by written notice, given in accordance with the terms of this Section.

Unless otherwise specified in this Agreement, notice shall be deemed effective: (a) on the date hand delivered, (b) on the first business day following the sending thereof by overnight courier, and (c) on the fifth calendar day (or, if it is not a business day, then the next succeeding business day thereafter) after the depositing thereof into the exclusive custody of the U.S. Postal Service, except for a notice of change of address, which shall be deemed effective only upon receipt.

5.10    Construction.  In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  The Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

5.11    No Third-Party Beneficiaries.  This Agreement is not intended, and shall not be deemed, to confer upon or give rights to any person except as otherwise expressly provided herein.

5.12    Counterparts.  This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed an original instrument.

5.13    Entire Agreement.   This Agreement sets forth all the promises, covenants, agreements and conditions between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, expressed or implied, oral, written or otherwise, except as set forth herein.

5.14    Cooperation.  At all times during and after separation of employment, the Parties hereto shall cooperate in effecting an orderly transition of the business contemplated by this Agreement to avoid any interruption in the handling of the business contemplated by this Agreement.

5.15    Disclosure.  Employee will fully disclose the terms of this Agreement to any entity or person prior to entering into any business relationship of any kind whatsoever with such entity or person.

5.16    Consultation.  Employee agrees and acknowledges that, prior to signing, Company has granted Employee sufficient time to review the Agreement, including allowing Employee (in Employee's sole discretion) to take the Agreement home for further study and review.  Company has encouraged Employee to freely discuss the terms of this Agreement with any lawyer of Employee's choosing prior to signing.

5.17    No Reliance.  Employee is not resigning Employee's employment or relocating a residence in reliance on any promise or representation by Company regarding any guaranteed length of employment or guaranteed compensation by Company.

5.18    Incorporation.  The attachments identified in this Agreement constitute a part of this Agreement and are hereby expressly and specifically incorporated herein by reference in their entirety as if fully set forth in this Agreement.

5.19    Arbitration; Jury Waiver; Collective Action Waiver.   As a condition of employment, Employee agrees and acknowledges that Company and Employee will utilize binding arbitration to resolve all disputes arising out of or relating to Employee's employment with Company.  Both Company and Employee mutually agree that any claim, dispute and/or controversy that either Employee may have against Company (or its owners, directors, officers, managers, employees, and agents) or Company may have against Employee, arising from, related to, or having any relationship or connection whatsoever with Employee seeking employment with, employment by, or other association with Company, shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ("FAA").  Included within the scope of this Arbitration Agreement are all disputes, whether based in tort, contract, statute, equitable law, or otherwise.

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

Excluded from this Arbitration Agreement are claims that are not arbitrable pursuant to federal or state law including workers' compensation claims, unemployment compensation claims, or the right to file an administrative charge before a governmental agency, such as the Equal Employment Opportunity Commission (EEOC), National Labor Relations Board (NLRB), or the Department of Labor (DOL), or other claims that as a matter of law cannot be subject to arbitration. For purposes of this provision the following matters may not be subject to arbitration: (i) matters relating to enforcement of the provisions under the Article titled **"Protected Information and Restrictive Covenants"**, which Company may seek to enforce in any court of competent jurisdiction; and (ii) joinder by Company of Employee as a third party defendant in any suit brought against Company.

The following conditions are mutually agreed upon by both parties to this Arbitration Agreement:

(a) Any relief that would otherwise be available in a court action is equally available to the parties in connection with the arbitration proceedings;

(b) In addition to any other requirements imposed by law, disputes shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") before a qualified individual, to whom the parties may mutually agree pursuant to AAA's Employment Arbitration Rules and Mediation Procedures (found at https://www.adr.org), and shall be subject to disqualification on the same grounds as would apply to a judge of such court;

(c) The procedures of the arbitration shall be governed by the Ohio Code of Civil Procedure and Ohio Rules of Court. To the extent permissible under applicable law, any and all hearings or other proceedings shall be held at a place in Cuyahoga County, Ohio;

(d) The Arbitrator shall have the authority to allow for appropriate discovery and exchange of information before a hearing, including, but not limited to: interrogatories, requests for production of documents, requests for admission, depositions, and the issuance of subpoenas. The parties shall be permitted enough discovery to gather necessary evidence to prove their claims or defenses;

(e) Awards shall include the Arbitrator's written and well-reasoned opinion(s). The Arbitrator shall issue a written opinion and award, in conformance with the following requirements: (i) the opinion and award must be signed and dated by the Arbitrator; (ii) the Arbitrator's opinion(s) and award shall decide all issues submitted; (iii) the Arbitrator's opinion and award shall set forth the legal principals supporting each part of the opinion(s); and (iv) the Arbitrator shall have the same authority to award remedies and damages as provided to a judge and/or jury under parallel circumstances in a civil action;

(f) Company shall pay the costs associated with the arbitration, except for those costs which the employee would routinely be required to pay in court litigation. If Employee works or resides in the state of California, costs paid by Company shall include the amount of any arbitration filing fees in excess of filing fees that would be imposed if Employee filed the same claim(s) in a court or administrative body of competent jurisdiction. To the extent permissible under applicable law, each party shall be responsible for its own attorneys' fees, except that the Arbitrator may award attorneys' fees to the prevailing party consistent with applicable state or federal law;

(g) Judgment upon the award rendered by the Arbitrator may be entered as a judgment in any court having jurisdiction thereof; and

**(h) COMPANY AND EMPLOYEE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE/MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

This Arbitration Agreement shall survive termination of Employee's employment with Company. The parties may only revoke or modify this Arbitration Agreement with a written instrument, demonstrating the unambiguous, mutual intent of the parties, signed by Employee and the President/Owner(s) of Company. If a court or administrative body of competent jurisdiction deems any term or provision of this Arbitration Agreement illegal, otherwise invalid, or incapable of being enforced to any extent, such term or provision shall be severed to the extent of such invalidity or unenforceability; all other terms hereof shall remain in full force and effect; and, to the extent permitted and possible, Employee and Company agree that the body making the determination of invalidity or unenforceability shall have the power to replace the invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and that this Arbitration Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

Employee understands and agrees that both Employee and Company give up the right to trial by jury of any claim each may have against the other. Employee understands that the AAA's filing fees are typically more expensive than the filing fees in a court of law. Further, the AAA may interpret and enforce the rules of procedure and evidence in a different manner than a court of law or administrative body. For a full set of the AAA's rules and more information on the AAA's arbitration process, please visit www.adr.org. Employee's signature below indicates Employee's agreement to the alternative dispute resolution processes described herein.

11

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

**EMPLOYEE'S SIGNATURE BELOW CERTIFIES THAT EMPLOYEE HAS READ, UNDERSTANDS, AND AGREES TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS. EMPLOYEE'S SIGNATURE ALSO CERTIFIES THAT COMPANY HAS PROVIDED EMPLOYEE THE OPPORTUNITY TO REVIEW THIS AGREEMENT WITH LEGAL COUNSEL OF EMPLOYEE'S CHOICE AND EMPLOYEE HAS CONSULTED WITH COUNSEL OR, ALTERNATIVELY, EMPLOYEE HAS WILLINGLY WAIVED SUCH OPPORTUNITY.**

**DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE AGREEMENT AND ACKNOWLEDGMENT**

IN WITNESS WHEREOF, the Parties hereto have caused their names to be hereunto subscribed, all as of the day and year first above written.

**EMPLOYEE:**                                                                   **CROSSCOUNTRY MORTGAGE, LLC:**

_____                          _____
CD5E52DA2AE64C0                                                          A407916AAB2E4CB

Paul Lundholm                                                                     Alex J. Ragon
                                                                                             It's Chief Legal Counsel

12

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE



**EXHIBIT A**
**OUTSIDE SALES LOAN ORIGINATOR COMPENSATION**
**BRANCH #5804**

Employee's compensation shall be determined and calculated in accordance with this Exhibit A. In no case will Employee's compensation vary based on the terms or a proxy for the terms of a loan.

**I.**   **Employee Compensation.**

Employee Name:  _____ Paul Lundholm _____

For each pay period, Employee shall earn compensation of (A) Base Pay and/or (B) Commission Amount as indicated below.

**A)** **Base Pay.** "Base Pay" means an amount equal to the fixed guaranteed payment of:
(Required: Must check one)

☐   Bi-Weekly Salary:

**OR**

☒   None (No hourly or monthly salary)

☐   Check this box if Base Pay is Draw against Commission

**B)** **Commission Amount.** For every Eligible Loan the Employee Originates in the month, Company will pay Employee a "Commission" calculated as follows:

Employee will be paid the following BPS of the principal amount of the credit extended for each Eligible Loan that is classified as follows:

| | |
|---|---|
| Self-Generated Lead: | 100 BPS |
| Branch-Generated Lead: | 50 BPS |
| Brokered (Cannot be underwritten and funded by Company): | 50 BPS |
| Current Customer: | 75 BPS |

For purposes of compensation based on lead source, the Company lead source form must be completed by the Employee at the time of application and uploaded to Encompass.  The lead source form will identify the lead source (self, branch or MSA).  The lead source may NOT be changed or amended at any time.

For purposes of compensation based on the Company's ability to underwrite and fund the loan, the compensation ONLY applies to loans that the Company cannot either underwrite or fund.  The factor is not whether it was or was not underwritten or funded by the Company, but whether it could have been either underwritten or funded by the Company.

There also is to be a minimum commission dollar amount per loan of $ <u>N/A</u> and a maximum commission dollar amount per loan of $ <u>N/A</u>.

If the Employee's Base Pay is a draw against commission, then the commissions here are subject to a reduction for the amount of Base Pay identified under Section I-A of this Exhibit payable during the pay period the loan was closed, as well as a reduction for any amounts previously paid as Base Pay that has not already been taken into account by a prior calculation.

13

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

**C) Advanced Amounts, Early Pay Offs & Early Payment Defaults.** Employee is only considered to have earned and be entitled to payment of a Commission Amount on Eligible Loans. If an originated loan that has closed and been funded becomes subject to an Early Pay Off or Early Payment Default, the loan is not an Eligible Loan under this Agreement, and Employee is not entitled to Commission Amount on such loan. Notwithstanding the foregoing, Company may advance Commission Amounts for all Eligible Loans that meet (a), (b) and (c) of the Eligible Loan definition, as applicable, in the next payment cycle. If the Commission Amount has been advanced on a loan that later results in an Early Pay Off or Early Payment Default, Employee shall owe Company the amount advanced to the Employee on such ineligible loan. In such case, subject to applicable law, (a) if Employee is still employed by Company, Company will reduce the amount of any such unearned advancement from the next Commission Amount payment to Employee; or (b) if Employee is no longer employed by Company, Employee shall reimburse Company the amount of any such unearned advancement in cash or check within 30 days of Company's notification to Employee of the amount due. Notwithstanding the foregoing, in no case will Employee receive less than the applicable minimum wage for any hours worked in each workweek during the employment period.

## II.    Periodic Reviews

Company will evaluate no more than quarterly the compensation paid to its loan originators based on factors such as loan performance, transaction volume and current market conditions and prospectively revise the compensation it agrees to pay to Employee. Company shall have the right, at its sole discretion, to modify this compensation schedule (Exhibit A), in whole or in part, at any time on a prospective (but not a retroactive) basis. In such event, Company shall issue and deliver to Employee a new Exhibit A which reflects such changes which shall, as of the effective date stated thereon, supersede and replace the prior Exhibit A. Upon modification of this Exhibit A, the calculations herein will apply to all transactions with a locked rate that is prior to the effective date of such modification.

## III.    Definitions

As used herein and in the Employment Agreement:

"**Basis Point**" is equal to one hundredth of one percentage point (0.01%) of the gross loan amount stated in the Note at settlement.

An "**Early Payment Default**" occurs when a loan becomes past due as defined by the guidelines set by the investor that purchased the loan.

An "**Early Pay Off**" occurs when a loan is repaid in full, for any reason, within the time frame set by the investor that purchased the loan.

An "**Eligible Loan**" is defined as a residential mortgage loan (a) that is originated in accordance with Applicable Requirements; (b) that is closed and funded in accordance with Applicable Requirements, in the period in which the Commission is calculated in the normal pay roll cycle; (c) that is not unfunded, cancelled or rescinded for any reason within three (3) business days after settlement; and (d) for which the period for any Early Payment Default and Early Pay Off has expired.

EMPLOYEE ACKNOWLEDGES AND AGREES THAT ONLY LOANS CLOSED AND FUNDED AS OF THE EMPLOYEE'S LAST DAY OF EMPLOYMENT WITH THE COMPANY WILL BE ELIGIBLE FOR COMMISSIONS REGARDLES OF THE REASON FOR TERMINATION OR RESIGNATION.

"**Originate**" means, without limitation, at the combination of at least the following activities with respect to a particular loan: [soliciting the potential applicant for a mortgage loan; taking information from the applicant and filling out the application; educating the applicant in the home buying and financing process; advising the applicant about different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product; collecting financial information (such as tax returns and bank statements) and other related documents that are part of the application process; assisting the applicant in understanding and clearing credit problems; maintaining regular contact with the applicant, real estate broker/agent and Company during the time between application and closing to apprise each of the status of the application and to gather additional information as needed; ordering requests for mortgage and other loan verifications; providing the applicant with appropriate disclosures (such as truth in lending disclosures and good faith estimates); participating in the loan closing; and performing such other acts that are reasonably related or necessary to the above-mentioned activities, or as required by Applicable Requirements.]

DocuSign Envelope ID: D2959476-9387-4994-8AC1-E520AB23E0BE

**By signing below, Employee acknowledges that he/she is engaged in outside sales activities, including, without limitation, the sale of, solicitation of sales, promotional activities inclusive but not limited to attending conferences, open houses, and/or various networking events, either with potential clients or sourcing leads that could lead to a potential clients, and/or other activities incidental and in conjunction to such activities, at least 1-4 hours, once or twice per week.  Employee agrees to periodically re-certify to the foregoing at Company's request, as required by the Company, but no less than every 90 days.  Employee agrees that if this job duties or description changes, Employee will immediately provide notice to the Company in writing.**

Employee and Company hereby agree to Employee's compensation as set forth in this Exhibit A, which shall be effective as of **DATE OF HIRE**.

**EMPLOYEE INFORMATION**

DocuSigned by:

CD5E52DA2AE64C0...

*Paul Lundholm*

**BRANCH MANAGER INFORMATION**

DocuSigned by:

Michael Piazza

795ED7B08AE2406...

*Michael Piazza*

15

**Subject**
Please DocuSign: Lundholm, Paul COMP AGRE.docx

**Document**
Lundholm, Paul COMP AGRE.docx

**Document Id**
d2959476-9387-4994-8ac1-e520ab23e0be

**Recipients**
Jennifer Brozak, Michael Piazza, Paul Lundholm, Alex Ragon, Samantha Snyder

**Date Sent**
3/30/2022 | 04:26:18 pm

**Date Created**

**Status Date**
4/6/2022 | 04:34:16 pm

**Location**

**Holder**

**Time Zone**

Page 1 of 6

| Time | User | Action | Activity | Status |
|---|---|---|---|---|
| 3/30/2022 \| 04:24:00 pm | Samantha Snyder | Registered | The envelope was created by Samantha Snyder | Created |
| 3/30/2022 \| 04:26:18 pm | Samantha Snyder | Sent Invitations | Samantha Snyder sent an invitation to Jennifer Brozak [JBrozak@myccmortgage.com] | Sent |
| 3/31/2022 \| 08:24:38 am | Jennifer Brozak | Opened | Jennifer Brozak opened the envelope [documents:(Lundholm, Paul COMP AGRE.docx)] | Sent |
| 3/31/2022 \| 08:24:41 am | Jennifer Brozak | Viewed In-Session | Jennifer Brozak viewed the envelope in a session hosted by CrossCountry Mortgage, LLC [documents:(Lundholm, Paul COMP AGRE.docx)] | Sent |
| 3/31/2022 \| 08:24:52 am | Jennifer Brozak | Signed | Jennifer Brozak signed the envelope | Sent |
| 3/31/2022 \| 08:24:55 am | Samantha Snyder | Sent Invitations | Samantha Snyder sent an invitation to Michael Piazza [michael.piazza@myccmortgage.com] | Sent |
| 3/31/2022 \| 08:26:46 am | Michael Piazza | Opened | Michael Piazza opened the envelope [documents:(Lundholm, Paul COMP AGRE.docx)] | Sent |
| 3/31/2022 \| 08:26:58 am | Michael Piazza | Viewed | Michael Piazza viewed the envelope [documents:(Lundholm, Paul COMP AGRE.docx)] | Sent |
| 3/31/2022 \| 08:27:23 am | Michael Piazza | Signed | Michael Piazza signed the envelope | Sent |
| 3/31/2022 \| 08:27:25 am | Samantha Snyder | Sent Invitations | Samantha Snyder sent an invitation to Paul Lundholm [zuckus343@yahoo.com] | Sent |


EXHIBIT B

| Language | IP | Source |
|---|---|---|
| English (us) | 173.88.156.36 | api |
| English (us) | 173.88.156.36 | api |
| English (us) | 99.130.57.128 | web |
| En | 99.130.57.128 | web |
| En | 99.130.57.128 | web |
| En | 99.130.57.128 | web |
| English (us) | 50.212.125.149 | web |
| En | 50.212.125.149 | web |
| En | 50.212.125.149 | web |
| En | 50.212.125.149 | web |

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 4/4/2022 \| 03:40:30 pm | Paul Lundholm | Opened | Paul Lundholm opened the envelope [documents:(Lundholm, Paul COMP AGRE.docx)] | Sent |
| 4/4/2022 \| 03:40:37 pm | Paul Lundholm | Viewed | Paul Lundholm viewed the envelope [documents:(Lundholm, Paul COMP AGRE.docx)] | Sent |
| 4/4/2022 \| 03:49:57 pm | Paul Lundholm | Signed | Paul Lundholm signed the envelope | Sent |
| 4/4/2022 \| 03:49:59 pm | Samantha Snyder | Sent Invitations | Samantha Snyder sent an invitation to Alex Ragon [ARagon@myccmortgage.com] | Sent |
| 4/6/2022 \| 04:33:59 pm | Alex Ragon | Opened | Alex Ragon opened the envelope [documents:(Lundholm, Paul COMP AGRE.docx)] | Sent |
| 4/6/2022 \| 04:34:05 pm | Alex Ragon | Viewed In-Session | Alex Ragon viewed the envelope in a session hosted by CrossCountry Mortgage, LLC [documents:(Lundholm, Paul COMP AGRE.docx)] | Sent |
| 4/6/2022 \| 04:34:11 pm | Alex Ragon | Signed | Alex Ragon signed the envelope | Sent |
| 4/6/2022 \| 04:34:14 pm | Samantha Snyder | Printable Copy Attached to Email | Samantha Snyder was sent the document (Lundholm, Paul COMP AGRE.docx.pdf) attached to the completed email | Completed |
| 4/6/2022 \| 04:34:14 pm | Jennifer Brozak | Printable Copy Attached to Email | Jennifer Brozak was sent the document (Lundholm, Paul COMP AGRE.docx.pdf) attached to the completed email | Completed |
| 4/6/2022 \| 04:34:15 pm | Michael Piazza | Printable Copy Attached to Email | Michael Piazza was sent the document (Lundholm, Paul COMP AGRE.docx.pdf) attached to the completed email | Completed |

| Language | IP | Source |
| --- | --- | --- |
| English (us) | 108.50.228.55 | web |
| En | 108.50.228.55 | web |
| En | 108.50.228.55 | web |
| En | 108.50.228.55 | web |
| English (us) | 208.40.28.146 | web |
| En | 208.40.28.146 | web |
| En | 208.40.28.146 | web |
| En | 208.40.28.146 | web |
| En | 208.40.28.146 | web |
| En | 208.40.28.146 | web |

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 4/6/2022 \| 04:34:15 pm | Paul Lundholm | Printable Copy Attached to Email | Paul Lundholm was sent the document (Lundholm, Paul COMP AGRE.docx.pdf) attached to the completed email | Completed |
| 4/6/2022 \| 04:34:15 pm | Alex Ragon | Printable Copy Attached to Email | Alex Ragon was sent the document (Lundholm, Paul COMP AGRE.docx.pdf) attached to the completed email | Completed |

| Language | IP | Source |
|---|---|---|
| En | 208.40.28.146 | web |
| En | 208.40.28.146 | web |