UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| PAUL LUNDHOLM, ROBERT DIRUSSO and MAX ROSA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CROSSCOUNTRY MORTGAGE, LLC,<br><br>Defendant. | CASE NO. 1:23-cv-00285-DAP<br><br>JUDGE DAN AARON POLSTER |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR COURT-SUPERVISED NOTICE TO POTENTIAL OPT-IN PLAINTIFFS AND EQUITABLE TOLLING**

I.  **INTRODUCTION**

Plaintiffs Paul Lundholm ("Lundholm"), Bob DiRusso ("DiRusso"), and Max Rosa ("Rosa") (the "Named Plaintiffs") filed the Amended Complaint in this matter on April 28, 2023, on behalf of themselves and other similarly situated employees, pursuant to 29 U.S.C. § 216(b).[1] The Named Plaintiffs allege that Defendant CrossCountry Mortgage, LLC ("CCM" or "Defendant"): (i) required Plaintiffs and similarly-situated employees to agree to repay wages and/or took improper deductions from wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 20, *et seq.*; and (ii) misclassified Plaintiffs and similarly situated employees as exempt employees and failed to pay them for all hours worked, including overtime

---

[1] To date, a total of four Plaintiffs have opted-in to this lawsuit.  See Dkt. No. 12.

1

compensation at the rate of one and one-half times their regular payrates for the time they worked in excess of 40 hours each workweek, in violation of the FLSA. The Named Plaintiffs now move for court-supervised notice to potential plaintiffs and equitable tolling.

CCM willfully utilized a pay scheme that violates the FLSA and attempted to protect itself from scrutiny through an unlawful dispute resolution scheme. Consistent with the Sixth Circuit's decision in *Clark v. A&L Homecare and Training Ctr.*, Nos. 22-3101-3102, 2023 WL 3559657 (6th Cir. May 19, 2023), the Named Plaintiffs request that the Court authorize notice to potential plaintiffs who were harmed by CCM's common, unlawful policies. The Amended Complaint identifies two groups of similarly situated potential plaintiffs:

> All people who worked as Loan Originators, Loan Officers, Senior Loan Officers, or similar positions for Defendant, its subsidiaries, or affiliated companies at any time during the maximum limitations period who executed agreements that required them to repay wages to Defendant.

(referred to as the "Kickback/Deduction Collective"); and:

> All people who worked as Loan Originators, Loan Officers, Senior Loan Officers, or similar positions for Defendant, its subsidiaries, or affiliated companies at any time during the maximum limitations period who were not paid at least the minimum wage required by federal law for all hours worked and/or who worked more than 40 hours in any week without receiving all overtime compensation required by federal law.

(referred to as the "Misclassification Collective"). The members of the proposed collectives are referred to herein as "Potential Plaintiffs".

The Potential Plaintiffs are similarly situated to the Named Plaintiffs because they performed the same primary duties (inside sales), under the same pay scheme ("Unvested Wage Advances" and commissions only), they worked overtime but CCM did not track the hours they

worked, and they were required to sign the same unlawful agreements including an agreement that required them to repay wages to CCM. Notice and equitable tolling is important so that individuals who were harmed by CCM's common policies can fairly vindicate their rights.

II. **STATEMENT OF FACTS**

CCM is a retail mortgage lender that employs "more than 8,000 employees" at more than 600 branches across the United States. https://crosscountrymortgage.com/about-us/ Throughout the period from March 2020 through at least November 2022 (the "Relevant Period"), CCM hired and employed hundreds of "Loan Originators," "Loan Officers," "Senior Loan Officers," and employees in similar job titles (referred to herein as "Loan Salespeople") throughout the United States. (Declaration of Paul Lundholm ("Lundholm Dec.") ¶ 9; Declaration of Robert DiRusso ("DiRusso Dec.") ¶ 4; Declaration of Todd Baker ("Baker Dec.") ¶ 5).

The offer letters that CCM provided to Loan Salespeople characterized their positions as "outside" sales positions. These offer letters were not accurate, at least during the Relevant Period, because the primary duty of CCM's Loan Salespeople was to sell loans to prospective customers from their home offices or a CCM office. (Lundholm Dec. ¶ 10; DiRusso Dec. ¶ 10; Declaration of Maxwell Rosa ("Rosa Dec.") ¶ 9; Baker Dec. ¶ 8). To meet CCM's productivity requirements, Loan Salespeople regularly worked more than forty hours per week during this period. (Lundholm Dec. ¶ 13; DiRusso Dec. ¶ 12; Rosa Dec. ¶ 12; Baker Dec. ¶ 10). CCM Managers were aware that Loan Salespeople were working in excess of forty hours per week and that they were only paid commissions and "unvested wage advances." (Lundholm Dec. ¶ 15; DiRusso Dec. ¶ 14; Baker Dec. ¶ 11).

CCM did not track the hours that Loan Salespeople worked. (Lundholm Dec. ¶ 14; DiRusso Dec. ¶ 13; Rosa Dec. ¶ 13; Baker Dec. ¶ 13). CCM did not pay Loan Salespeople a salary or hourly wages. (Lundholm Dec. ¶ 14; DiRusso Dec. ¶ 11; Rosa Dec. ¶ 11; Baker Dec. ¶ 9). Instead, CCM's common policy was to pay Loan Salespeople only two types of compensation: (1) "unvested wage advances;" and (2) commissions. (Lundholm Dec. ¶ 12; DiRusso Dec. ¶ 11; Baker Dec. ¶ 9).

The "unvested wage advances" that CCM paid to Loan Salespeople were also referred to as a "Sign-On Bonus", and CCM required Loan Salespeople who received these payments to agree to a Sign-On Bonus Agreement. (Lundholm Dec. ¶ 8, Att. A; DiRusso Dec. ¶ 8, Att. C; Rosa Dec. ¶ 6, Att. A; Baker Dec. ¶ 14 Att. B). By signing the Sign-On Bonus Agreement, the Loan Salesperson agreed that his or her wages were not "earned." (Sign-On Bonus Agreement ¶ 3(a)). The Sign-On Bonus Agreement states that the Unvested Wage Advance must be repaid "if Employee does not remain employed with Company for the full 24 months." The Sign-On Bonus Agreement elaborates:

> Stated differently, if Employee does not remain employed with Company for 2 years, Company may require Employee to pay back the bonus in full pursuant to paragraph 3, below. Time of employment less than 24 months, including partial months of employment, does not reduce the repayment obligation under this Agreement.

(Sign-On Bonus Agreement ¶ 2).

The Sign-On Bonus Agreement states that no wages paid to CCM's Loan Salespeople were paid "free and clear." Paragraph 3(b) of the Sign-On Bonus Agreement states:

> <u>Consent to Offset</u>. By signing below, Employee expressly gives Company a lien against any wages, accrued vacation time, incentive compensation payments, bonuses and/or commissions due to Employee at time of termination. Employee agrees that Company may deduct, to the extent permitted by applicable law, the repayment amount due Company under this Agreement from any amounts due

4

>Employee at time of termination. Employee also agrees that any tax consequences borne because of repayment of the Bonus will be the sole and exclusive responsibility of Employee.

The Sign-On Bonus Agreement also requires employees to agree to pay CCM's "reasonable costs, expenses, interest, and legal fees." (Sign-On Bonus Agreement ¶ 10).

CCM enforced the wage kickback terms of the Sign-On Bonus Agreement in several different ways. CCM took an unauthorized deduction from Named Plaintiff DiRusso's final paycheck to partially recover wages it had paid to him. (DiRusso Dec. ¶ 16, Att. D). CCM sued Lundholm in the Cuyahoga County Court of Common Pleas seeking to force him to repay wages to CCM. (Lundholm Dec. ¶ 19, Att. D). CCM took unauthorized deductions from Named Plaintiff Rosa's final paycheck and then sued him in the Cuyahoga County Court of Common Pleas seeking to force him to repay additional wages to CCM. (Rosa Dec. ¶¶ 15, 17 Atts. C and D).

On or about their first day of employment, CCM required Loan Salespeople to sign two agreements: the "Outside Sales Loan Originator Employment Agreement" (Ex. A to Novak Aff., ECF No. 7-1) (the "Employment Agreement") and the Sign-On Bonus Agreement. (Lundholm Dec. ¶ 8, Att. A; DiRusso Dec. ¶ 8, Atts. B and C; Rosa Dec. ¶¶ 6, 8, Atts. A and B; Baker Dec. ¶ 14, Atts. A and B). The Employment Agreement includes an arbitration provision and class action waiver.

The terms of the Employment Agreement and the Sign-On Bonus Agreement conflict in material ways:

| Topic | Employment Agreement | Sign-On Bonus Agreement |
|---|---|---|
| Resolution of disputes | As a condition of employment, Employee agrees and acknowledges that Company and Employee will utilize | Employee intends to and hereby confers jurisdiction upon the courts of the State of Ohio and U.S. federal courts located |

5

| | | |
|---|---|---|
| | binding arbitration to resolve all disputes arising out of or relating to Employee's employment with Company. Both Company and Employee mutually agree that any claim, dispute and/or controversy that either Employee may have against Company (or its owners, directors, officers, managers, employees, and agents) or Company may have against Employee, arising from, related to, or having any relationship or connection whatsoever with Employee seeking employment with, employment by, or other association with Company, shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ("FAA"). Included within the scope of this Arbitration Agreement are all disputes, whether based in tort, contract, statute, equitable law, or otherwise. | within the State of Ohio to determine any dispute arising out of or related to this Agreement, including the enforcement and the breach hereof. |
| Who pays costs and Fees to resolve disputes? | Company shall pay the costs associated with the arbitration, except for those costs which the employee would routinely be required to pay in court litigation. …To the extent permissible under applicable law, each party shall be responsible for its own attorneys' fees, except that the Arbitrator may award attorneys' fees to the prevailing party consistent with applicable state or federal law. | Employee agrees to pay all reasonable costs, expenses, interest, and legal fees incurred by the Company to enforce this Agreement. |

While the arbitration provision of the Employment Agreement purports to mutually bind CCM and its employees to resolve "all disputes arising out of or relating to Employee's employment with Company," as stated above, CCM routinely disregards the Employment Agreement and sues former employees in court, seeking to impose all costs related to that litigation on the employees.

## III. Argument

This Court should authorize notice to Potential Plaintiffs because the Named Plaintiffs have met their burden of demonstrating a strong likelihood that the Named Plaintiffs and Potential Plaintiffs are similarly situated. CCM attempted to use a pay scheme that violates the FLSA to shift the risk of a decline in mortgage sales onto its Loan Salespeople. If CCM's pay scheme was enforced, an employee could work a significant number of hours for CCM and end up owing CCM money.

Named Plaintiff Lundholm is a good example. CCM recruited him after a successful nine-year career with a competitor. It offered him an "unvested wage advance" of $130,000.00 (before taxes). Lundholm worked for CCM from April 4 through November 2, 2022. During this seven-month period, Lundholm regularly devoted more than forty hours per week to his job duties. All of his work was done from his home office. Lundholm was unable to close any loans during this period and CCM did not pay him any commissions.

On November 2, 2022, CCM involuntarily terminated Lundholm's employment. By letter dated December 7, 2022, CCM demanded that Lundholm repay $81,371.83.[2] On February 7, 2023, CCM sued Lundholm in the Cuyahoga County Court of Common Pleas to enforce the

---

[2] CCM was purportedly seeking the net amount Lundholm received after paying taxes.

Sign-On Bonus Agreement.³ CCM sought "$81,371.83 plus interest, together with the costs of this action." If CCM was successful on this claim, Lundholm would be forced to pay CCM more than it paid him for seven months of work.

While Lundholm was able to find an attorney to assist him, many of the thousands of individuals who have been victimized by CCM's unlawful policies do not know that their FLSA rights are implicated. Many probably believe that the Sign-On Bonus Agreement is enforceable and that, if they challenge that agreement, they are at risk of being required to pay CCM's attorneys' fees and costs out of their earned wages. Many of these individuals are also probably unaware that CCM misclassified them as exempt employees. These individuals are similarly situated to the Named Plaintiffs and should receive notice and a fair opportunity to vindicate their rights.

### A. The FLSA Authorizes Notice to Similarly Situated Employees

The FLSA requires employers to pay nonexempt employees at least the minimum wage for all hours worked. 29 U.S.C. § 206. The FLSA also provides that "no employer shall employ any of his employees . . . for a work week longer than forty hours unless such employee receives compensation for his employment in excess of the hours worked above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207 (a). Employers must maintain accurate records of all hours worked by employees. 29 U.S.C. § 211(c).

An employee who is not paid in accordance with the FLSA's requirements can sue an employer who violates these requirements. 29 U.S.C. § 216(b). Under the FLSA, "any one or more employees" may bring an action to recover liability for unpaid minimum wages, overtime

---

³ CCM's lawsuit falsely claims Lundholm "resigned from his position" with CCM.

8

compensation, and liquidated damages "for and in behalf of himself or themselves and other employees similarly situated." *Id*. The FLSA's opt-in mechanism provides that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id*. In *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989), the Court determined that the FLSA contemplates notice to potential plaintiffs and "[t]he district court may use its discretion to authorize notification of similarly situated employees to allow them to opt into the lawsuit."

In *Clark v. A&L Homecare and Training Ctr.*, 2023 WL 3559657, the Sixth Circuit established a new standard for the "similarly situated" inquiry, which it described as an inquiry "to determine whether the merits of other-employee claims would be similar to the merits of the original plaintiffs' claims—so that collective litigation would yield 'efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.'" *Id*. at *5.[4] Whether potential plaintiffs are "similarly situated" to named plaintiffs in this context "typically depends on whether they performed the same tasks and were subject to the same policies – as to both timekeeping and compensation." *Id*. at *3.

---

[4] The dissent in *Clark* reiterates: "I remind district courts that today's ruling addresses how much a plaintiff must show to satisfy a district court that other employees exist who, upon further inquiry, will be found to be similarly situated to the plaintiff; it does not address the underlying threshold for FLSA similarity, which remains the same. *See O'Brien*, 575 F.3d at 584 (contrasting relatively low FLSA similarity standard with Rule 23 standard); *see also Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 533, 546-47 (6th Cir. 2006) ("similar, not identical" (*quoting Pritchard v. Dent Wizard Int'l*, 210 F.R.D. 591, 595 (S.D. Ohio 2002)). And district courts should avoid abusing their discretion by "refusing to allow notice to putative collective action members, or in [making a final similarity decision] too early or too late." *Campbell*, 903 F.3d at 1110 (*citing Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 580 (7th Cir. 1982))."

The *Clark* court held that an FLSA plaintiff seeking court-authorized notice must show a "strong likelihood" that the named plaintiffs and the potential plaintiffs are similarly situated. *Id.* at *4. The court rejected the "lenient standard" for "conditional certification" established in *Lusardi v. Xerox Corp.*, 99 F.R.D. 89, 90 (D.N.J. 1983). But the Court also refused to adopt a requirement that an FLSA plaintiff prove, by a preponderance of the evidence, that the named plaintiffs and potential plaintiffs are similarly situated, rejecting *Swales v. KLLM Transport Services, L.L.C.*, 985 F.3d 430, 434 (5th Cir. 2021).

Recognizing that the decision to authorize notice to potential plaintiffs is a "provisional" decision, the *Clark* court adopted the "strong likelihood" standard from jurisprudence regarding preliminary injunctions. *Clark,* at *4. The required showing is less than a preponderance but is "greater than the [showing] necessary to create a genuine issue of fact." *Id*. The plaintiff seeking notice must establish "more than a mere possibility of success" for the "similarly situated" inquiry, "[h]owever, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir., July 17, 1997); *see also Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing  Company*, 860 F.3d 844 (6th Cir., June 26, 2017) (holding that plaintiff does not have a "strong likelihood" of success for purposes of a preliminary injunction when "the sole basis on which plaintiff intends to succeed at trial is without legal support.").

As Judge White points out in *Clark*, because this new standard only requires one part of the showing required for a preliminary injunction "the necessary showing is far less demanding than for a preliminary injunction itself," and "although the showing for notice is no longer

10

'lenient' or 'modest,' this does not mean the standard is necessarily higher than all prior applications of the earlier standard." *Clark,* at *11. The court should authorize notice where the plaintiff presents evidence that there is a "strong likelihood" that they and the people to whom they seek to send notice experienced the same FLSA violations.

> **B.      The Evidence Submitted with This Motion Establishes a Strong Likelihood That the Potential Plaintiffs Are Similarly Situated to the Named Plaintiffs**

The Named Plaintiffs request that the Court authorize notice to individuals who worked for CCM as Loan Salespeople under the same policies and agreements that give rise to the Named Plaintiffs' FLSA claims.

> **1.      Unlawful Deduction/Wage Kickback Claims**

The Named Plaintiffs contend that CCM violated the FLSA by requiring Loan Salespeople to agree to the terms of CCM's Sign-On Bonus Agreement. The Sign-On Bonus Agreement requires Loan Salespeople to repay, or "kick-back," wages to CCM. CCM also violated the FLSA by taking unauthorized deductions from Loan Salespeople's wages and by suing them to force them to repay wages. (Am. Compl. ¶¶ 54-60).

The Sign-On Bonus Agreement, on its face, violates the FLSA. 29 C.F.R. § 531.35 states:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee.

*see also, Ketner v. Branch Banking and Trust Co.,* 143 F.Supp.3d 370 (M.D.N.C. 2015).

After the notice and opt-in process is complete, Plaintiffs will seek a declaratory judgment to nullify the unlawful provisions of the Sign-On Bonus Agreement. Because this claim is based on the terms of an agreement that was executed by the Named Plaintiffs and all Potential

11

Plaintiffs, the Named Plaintiffs have met their burden of showing a strong likelihood that they and the Potential Plaintiffs are similarly situated with respect to this claim.

### 2. Misclassification Claims

The Named Plaintiffs and Potential Plaintiffs are similarly situated with respect to their misclassification claims. The only plausible basis for CCM to have classified Loan Salespeople as exempt employees is the outside sales exemption.[5] DOL regulations define an outside salesperson as an employee (1) whose "primary duty" is "making sales within the meaning of [ 29 U.S.C. § 203(k)]" or "obtaining orders or contracts for services"; and (2) who is "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a). The phrase " 'customarily and regularly' means a frequency …greater than occasional but … less than constant." 29 C.F.R. § 541.701.

During the Relevant Period, CCM's Loan Salespeople did not qualify for the outside sales exemption because they almost exclusively performed their duties from their home offices or a CCM office. (Lundholm Dec. ¶ 10; DiRusso Dec. ¶ 10; Rosa Dec. ¶ 9; Baker Dec. ¶ 8). CCM's Loan Salespeople were inside salespeople. CCM should have been tracking their hours and should have paid them at least minimum wage and overtime premiums, but CCM chose to misclassify Loan Salespeople. The evidence submitted with this Motion meets the Named Plaintiffs' burden of showing a strong likelihood that they and the Potential Plaintiffs are similarly situated with respect to this claim.

---

[5] The duties of Loan Salespeople do not qualify for any other exemption. But even if they did, these exemptions are inapplicable because CCM did not pay Loan Salespeople a salary.

### 3. CCM's Arbitration Defense Does Not Preclude Notice

CCM will likely argue that notice is inappropriate because **all** of the Named Plaintiffs and Potential Plaintiffs were required to agree to an arbitration agreement that includes a class and collective action waiver.  (Novak Aff., ECF No. 7-1 , ¶ 3: "In order to be employed by CCM, CCM requires individuals to sign an employment agreement with an arbitration provision.").  Plaintiffs will oppose CCM's Motion to Compel Arbitration in accordance with the schedule set by the Court's March 30, 2023, Order.

The fact that the Named Plaintiffs and Potential Plaintiffs were required to execute a number of agreements related to dispute resolution does not impair Plaintiffs' request that the Court notify similarly situated individuals of their rights in this case.  Whether CCM's arbitration agreement is enforceable is a common issue that can be decided after Court-facilitated notice.  In *Clark,* the Sixth Circuit expressly held that district courts cannot and should not make a definitive determination at the notice stage as to whether an arbitration agreement is enforceable.  *Clark*, at *4 (*rejecting  JP Morgan Chase & Co.*, 916 F.3d 494, 503 (5th Cir. 2019) and *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1050 (7th Cir. 2020)).  Instead, the *Clark* decision directs district courts to limit their consideration of arbitration agreements to analyzing whether the named plaintiffs and potential plaintiffs are similar.  *Clark*, at *4-*5.  Here, the Named Plaintiffs and Potential Plaintiffs are similar because they were required to execute two dispute resolution agreements that conflict in material ways.  Whether CCM can compel the claims of Named

Plaintiffs and Potential Plaintiffs to arbitration is a common issue that should be decided in collective litigation.[6]

### C. The Court Should Equitably Toll the Limitations Period

"Equitable considerations support the use of tolling for FLSA collective actions." *Clark,* at *7. As Judge Bush points out, unlike Rule 23 class actions where the "class members' claims are deemed to relate back to the date of filing of the class action complaint" under *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1974), the FLSA limitations period runs until an individual opts-in to a collective case. *Clark,* at *6. Equitable tolling is important to ensure that Potential Plaintiffs receive "accurate and timely notice concerning the pendency of the collective action, so that [plaintiffs] can make informed decisions about whether to participate." *Id*. (*quoting Hoffmann- La Roche*, 493 U.S. at 170).

While the *Clark* Panel disagreed on a number of issues, there was no disagreement with respect to equitable tolling. Judge Kethledge's opinion does not address equitable tolling but instead states that district courts "should waste no time in adjudicating the motion [for notice]." *Id.* at *4. Judge Bush concurred specifically to stress the importance of equitable tolling and Judge White's concurring and dissenting opinion states: "district courts should freely grant equitable tolling to would be opt-in plaintiffs." *Id.* at *9. As a result, after *Clark*, equitable tolling should be freely granted to protect the rights of potential plaintiffs.

---

[6] CCM cannot compel Named Plaintiffs Lundholm and Rosa to litigate their claims in arbitration because CCM waived its right to compel arbitration when it sued these plaintiffs. *WorldSource Coil Coating, Inc. v. McGraw Const. Co.*, 946 F.2d 473, 479 (6th Cir. 1991). Separate from this waiver argument, however, Plaintiffs intend to oppose Defendant's Motion to Compel on grounds that are common to all Named and Potential Plaintiffs.

14

## CONCLUSION

Plaintiff respectfully requests that the Court authorize notice to Potential Plaintiffs (a proposed notice is attached as Exhibit E), direct CCM to provide contact information for individuals who are eligible to receive notice, and equitably toll the limitations period for the period from the date this motion was filed through the completion of the notice and opt-in process.

Respectfully submitted,

Dated:  June 6, 2023
        New York, New York

*/s/ Brendan Sweeney*

Brendan Sweeney
Law Office of Christopher Q. Davis
80 Broad Street, Suite 703
New York, NY 10004

bsweeney@workingsolutionsnyc.com
*Attorneys for Plaintiffs and the Proposed Collective and Class*

15